Carl McMICHAEL, Administrator of the Estate of Emma McMichael, Deceased, Appellee,

v.

UNITED STATES of America, Appellant,

Insurance Company of North America (Intervenor Below).

Mrs. Lamar BARTLETT; Winfred Lowe, Administrator of the Estate of Thelma Lowe; Mrs. Edna Rogers; Mrs. Flora Weaver; and Mrs. Georgia Ray, Appellees,

v.

UNITED STATES of America, Appellant,

Insurance Company of North America (Intervenor Below).

Leonard MADISON, Administrator of the Estate of Lula Mae Madison, Deceased, Appellee,

v.

UNITED STATES of America, Appellant,

Insurance Company of North America (Intervenor Below).

Gertie B. MITCHELL, Administratrix In Succession of the Estate of Eliza Walker, Deceased, Appellee,

v.

UNITED STATES of America, Appellant,

Insurance Company of North America (Intervenor Below).

Billy Dwayne MOODY, Administrator of the Estate of Geraldine Moody, Deceased, Appellee,

v.

UNITED STATES of America, Appellant,

Insurance Company of North America (Intervenor Below).

Willie D. KELLY, Administrator of the Estate of Shirley J. Kelly, Deceased, Appellee,

v.

UNITED STATES of America, Appellant,

Insurance Company of North America (Intervenor Below).

Billy HARRISON, Administrator of the Estate of Elsie Marie Harrison, deceased, Appellee,

v.

UNITED STATES of America, Appellant.

James STANCILE, Administrator of the Estate of Lula Mae Madison, Deceased, Appellant,

Gertie B. Mitchell, Administratrix In Succession of the Estate of Eliza Walker, Deceased, Appellant,

Willia H. Moody, Administrator of the Estate of Geraldine Moody, Deceased, Appellant,

Willie D. Kelly, Administrator of the Estate of Shirley J. Kelly, Deceased, Appellant,

v.

UNITED STATES of America, Appellee,

Highland Resources, Inc., Appellee.

Nos. 87–1634 to 87–1640 and 87–1707.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1988.

Decided Aug. 25, 1988.

See also, 8th Cir., 715 F.2d 1311.

Ralph Johnson, Washington, D.C., for U.S.

Bettina Brownstein, Little Rock, Ark., for Highland.

Bernard Whetstone, Little Rock, Ark., for Mitchell, Moody, Kelly & Stancile.

James Bruce McMath, Little Rock, Ark., for McMichael, Bartlett, Madison and Harrison.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The United States Department of Defense contracted with Celesco Industries, Inc., an independent contractor, to produce explosive photo-flash cartridges. On March 8, 1976, an explosion occurred at the Celesco plant in East Camden, Arkansas, killing seven employees, seriously injuring five, and causing minor injuries to numerous others. Consolidated cases were filed against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C.A. §§ 1346, 2671–2680 (1982) and Highland Resources, Inc. under state law, the owner and lessor of the building where the explosion occurred. The government appeals from the district court's [1] award of damages to the injured or killed employees, arguing that the court erred in ruling that the claims were not barred by the discretionary function exception to the FTCA and in holding that the government was negligent in failing to enforce safety standards at the plant. The employees cross-appeal, contending that the district court erred in ruling that Highland Resources was not liable under Arkansas products or strict liability statutes, or common law principles of negligence. For the reasons set forth below, we affirm.

This case is before us for the third time. The factual background is outlined in our first opinion, *Madison v. United States*, 679 F.2d 736, 737–38 (8th Cir.1982), and the procedural and appellate history is set forth in our second opinion, *McMichael v. United States*, 751 F.2d 303, 304–05 (8th Cir.1985).[2] After a bench trial in January

---

1. The Honorable Oren Harris, Senior United States District Judge for the Western District of Arkansas.

2. In *Madison,* we held that the district court erred in granting summary judgment against plaintiffs' claim that the government failed to enforce Celesco's compliance with safety regulations. We held that this claim was not protected by the discretionary function exception, 679 F.2d at 739–41, and we remanded the case for a determination of whether the plaintiffs' theory

1986 the district court made factual findings, which we recite below:

On June 20, 1975, the United States awarded Celesco a contract to produce highly explosive photo-flash cartridges. Before submitting the bid, the government required Celesco to secure a manufacturing facility. Celesco leased a former naval ammunition plant in East Camden, Arkansas from Highland Resources, a commercial lessor. Celesco, an experienced munitions manufacturer, had leased other buildings for similar purposes and had special knowledge of the construction requirements for buildings to be used in the production of munitions. Highland, on the other hand, did not possess such special knowledge.

Before awarding the contract to Celesco, the Defense Department required the Safety Manager of the Defense Contract Administrative Services Region (DSCAR) to review Celesco's safety procedures, processes, facility and personnel to determine whether Celesco could comply with the Department of Defense safety requirements. The survey concluded that Celesco and the facility complied with the department guidelines. It developed at trial, however, that the Safety Manager did not conduct an on-site evaluation of the plant at the time of the survey.

The contract between Celesco and the government required Celesco to promulgate safety provisions and comply with safety standards established by the Department of Defense Contractor's Safety Manual for Ammunition, Explosives and Related Dangerous Materials (DOD Manual) and the provisions of the Armed Services Procurement Regulations. *See* 32 C.F.R. § 7.104–79 (1984). These requirements and standards were incorporated into the contract. The contract delegated primary responsibility for safety to Celesco, and Celesco hired a full-time safety staff, headed by a safety engineer. Pursuant to the contract terms, the government provided Celesco with three on-site quality assurance representatives, or inspectors. One inspector was placed in Building M–35, the building where the explosion occurred, on a full-time basis. Although the primary responsibility of the inspector was to oversee Celesco's compliance with the quality requirements of the contract, safety review was also an integral part of his assigned tasks. The inspectors' regular procedures included a fifty-one step procedures review checklist for safety compliance. The Armed Services Procurement Regulations and the Celesco contract gave the inspectors the authority to require on-the-spot corrective action, and the contracting officer was authorized to cease production by withdrawing government inspectors until the safety violations were corrected.[3]

---

of recovery was cognizable under Arkansas law. On remand, the district court denied the government's motion to dismiss, ruling that Arkansas law permitted recovery. The government filed an interlocutory appeal, and we affirmed our earlier ruling regarding the discretionary function exception after consideration of the Supreme Court's decision in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *McMichael*, 751 F.2d at 310. The case was again remanded to the district court for a trial on the issue of liability. *Id.*

**3.** Armed Services Procurement Regulation § 7–104.79 provides that a safety clause be inserted in every contract for ammunition and explosives which includes the following provision:

(b) The contractor shall comply with the DoD Contractor's Safety Manual for Ammunition, Explosives and Related Dangerous Materials (DOD Manual 4145.26M), in effect on the date of the solicitation for this contract, as it relates to ammunition and explosives, and any other additional or more stringent requirements included in the schedule of this contract. If the Contracting Officer notifies the Contractor of any noncompliance with such Manual, or schedule provisions, the Contractor shall immediately take corrective action. If the Contractor fails or refuses to take corrective action within the time specified by the Contracting Officer, the Contracting Officer may direct the Contractor to cease performance on all or part of this contract, or until satisfactory corrective action has been taken. Any notification or direction under this paragraph should be in writing or confirmed in writing by the Contracting Officer. The Contracting Officer may at any time remove Government personnel whenever the Contractor is in noncompliance with the safety requirements of this clause. * * *

32 C.F.R. § 7.104.79 (1984).

The district court found a number of conditions at the Celesco plant did not comply with the safety requirements of the contract. For example, the lightning protection system was inadequate and there was no humidity control in Bay 4 of Building M–35, where the explosion occurred. Water was present in an area where detonation was likely to occur. (Moisture, in the form of water or humidity, is an initiating force for the photo-flash). Despite a sign directing that the steel blast doors to Bay 4 remain shut at all times, the doors were constantly left open. The open doors allowed the blast to spread down a hallway, where all but one of the killed or injured employees were at the time of the explosion. In addition, although there was conflicting testimony concerning the precise amount of the photo-flash in Bay 4, by any account the amount exceeded the limit approved by the government.[4] Shortly before the explosion, the Building M–35 government inspector informed Celesco's line supervisor that Bay 4 was overloaded. There was also testimony that defective loaded components, or "rejects," were stored in Bay 4, contrary to the safety requirements of the contract. Finally, the Department of Defense manual required evacuation of personnel in the event of an electrical storm, and the district court found that although on the morning of March 8, 1976, there was rain, thunder and lightning in the East Camden area, no evacuation of the plant was ordered. An explosion occurred in Building M–35, killing and injuring numerous employees.

The district court found that the government was negligent in failing to enforce the safety standards incorporated in its contract with Celesco. Specifically, the court ruled that the government inspectors were negligent in failing to order an evacuation until the storm passed and that this was the proximate cause of the employees' injuries. The court also concluded that the lessor of the Celesco Plant, Highland Resources, Inc. was not liable on any of the theories advanced by the employees and dismissed the counts against them.

### I.

The government first argues that the action is barred by the discretionary function exception to the FTCA, 28 U.S.C. 2680(a) (1982), and that the district court erred in refusing to consider whether the exception applied. For purposes of the government's motion for summary judgment, the parties entered into a stipulation of fact, which was before, and substantially relied upon by, this court in our earlier decisions. *See McMichael*, 751 F.2d at 305; *Madison*, 679 F.2d at 738 n. 3. The essence of the stipulation was that the contract imposed numerous mandatory safety standards on Celesco, but that the government, despite its "three onsite assurance inspectors," failed to enforce Celesco's compliance with those standards and thereby caused plaintiffs' injuries.[5] The govern-

---

**4.** The testimony concerning the amount of photo-flash at the time of the explosion ranged from 1400 to 2500 pounds. Bay 4 was originally limited to 400 pounds. Celesco raised the limits to 1700 pounds unilaterally, but with the knowledge of the government inspectors.

**5.** The stipulation provided:
  That at the time of the injuries in question, Celesco, Inc., was operating the munitions plant in question under contract with the Department of Defense. Its relationship with the Department of Defense was that of an independent contractor. The product being produced was a photo-flash cartridge which is potentially explosive. The activity was one which would generally be recognized as being inherently dangerous or ultrahazardous. Because of the volatile nature of the product, special skill and special facilities are required

to manufacture the cartridges in an acceptable and safe manner. Additionally, there are generally recognized procedures and precautions which should be utilized in the manufacturing process.
  It is further stipulated that Celesco did not have the requisite skills; that the facilities in question were inadequate; and that the generally recognized procedures were not followed; that government was aware, or could have learned of the various inadequacies mentioned above through its pre-award survey, its three on-sight assurance inspectors who were present throughout the operation, and through periodic spot-check inspections.
  Lastly, it is stipulated that the contract with Celesco contained numerous safety regulations and requirements which the contract required Celesco to comply with; that the requirements were inadequate in some re-

ment expressly reserved the right to contest all assertions set forth in the stipulation at trial.[6] After this court affirmed the district court's ruling that the discretionary function exception did not bar the employees' claim and remanded the case for trial, *McMichael,* 751 F.2d at 310, the government moved to vacate the stipulation, alleging that the stipulation was "fragmented" and "flawed." Although the district court vacated the stipulation, the court ruled that it was bound by this court's rulings in *Madison* and *McMichael* that the discretionary function exception did not apply. In view of the facts developed at trial, the government contends that the discretionary function exception applies and accordingly the district court was without subject matter jurisdiction. *See K.W. Thompson Tool Co., Inc. v. United States,* 836 F.2d 721, 726 n. 3 (1st Cir.1988). It is true that the district court did not reconsider whether the discretionary function applied. However, the court did make extensive findings of fact which bear upon this issue and in any event, we review *de novo* the application of the discretionary function exception. *See Berkovitz v. United States,* — U.S. —, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *McMichael,* 751 F.2d at 303; *see also Starrett v. United States,* 847 F.2d 539, 541 (9th Cir.1988) ("we review *de novo* a district court's determination that it lacks subject matter jurisdiction under the discretionary function exception"). Thus, the issue before us is whether the United States is exempt from FTCA liability because the acts of negligence found by the district court represent the exercise or performance of discretionary functions under section 2680(a).

### A.

The FTCA authorizes suits for damages against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). In such suits, the United States is liable in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. Suit is not allowed, however, for "[a]ny claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

After both the trial in this case, and briefing and oral arguments on appeal, the United States Supreme Court issued its decision in *Berkovitz v. United States,* — U.S. —, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), clarifying the scope of the FTCA discretionary function exception.

The Court reiterated that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies." *Berkovitz,* 108 S.Ct. at 1958 (citing *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764). In examining the nature of the challenged conduct, we are instructed to first consider whether the action is a matter of choice for the acting employee; conduct cannot be discretionary unless it involves an element of judgment or choice. *See Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953). Thus, the exception is not applicable when

---

spects, and that they were not enforced by the Department of Defense.

The question of proximate cause between any failure above-mentioned and the injuries is assumed to be satisfied.

**6.** We express some frustration with the government's position in this case. The government by entering into stipulations essentially obtained advisory opinions in *Madison,* 679 F.2d at 736, and *McMichael,* 751 F.2d at 303. When the result was not to its liking, it moved to vacate the stipulation arguing that it was fragmented, flawed, grossly incomplete, and erroneous. We consider this an unwarranted misuse of our limited judicial resources. The parties have not suggested that we should consider sanctions.

a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. *Berkovitz*, 108 S.Ct. at 1958–59.

■ If the challenged conduct does, however, involve an element of judgment, we must then determine whether that judgment is of the kind that the discretionary function exception was designed to shield. As stated in *Varig Airlines*, the basis for the exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." 467 U.S. at 814, 104 S.Ct. at 2765. Thus, the exception protects only governmental actions and decisions based on considerations of public policy. *Berkovitz*, 108 S.Ct. 1959 (citing *Dalehite*, 346 U.S. at 36, 73 S.Ct. at 968).

The Court examined Berkovitz's allegation that the Bureau of Biologics of the Food and Drug Administration (FDA) wrongfully approved release to the public a contaminated polio vaccine lot, looking first to the regulatory framework governing release of vaccine lots. The regulations required the vaccine manufacturers, not the FDA, to examine all lots before distribution to ensure compliance with regulatory standards. The regulations empowered, but did not require, the FDA to examine and prevent the distribution of noncomplying lots. The Court concluded that the regulatory scheme was substantially similar to the scheme in *Varig Airlines*, because the regulations allowed the Bureau to determine the appropriate way to regulate the release of vaccine lots, rather than mandating certain kinds of agency action. *Berko-*

*vitz* 108 S.Ct. at 1963–64. *See Varig Airlines*, 467 U.S. at 804–07, 104 S.Ct. at 2759–61. In this regulatory context, the Court held that the discretionary function exception barred any claim challenging the Bureau's formulation of policy as to the appropriate way in which to regulate the release of vaccine lots, and any claim challenging the officials in exercising any discretion the policy itself allowed for. *Berkovitz*, 108 S.Ct. at 1964. The Court based these rulings on *Varig Airlines*, in which it had earlier held that the Federal Aviation Administration's decision to review aircraft design and manufacture for compliance with FAA safety regulations through a certification process—involving a spot-check of the manufacturer's work—was a discretionary function; and that the FAA employees' execution of the spot-check program was discretionary. 467 U.S. at 819–20, 104 S.Ct. at 2767.

The Court further held that the exception did not apply to the Bureau's acts implementing that policy which did not involve the permissible exercise of policy discretion. *Berkovitz*, 108 S.Ct. at 1964. The latter type of claim was precisely the claim asserted by Berkovitz. Berkovitz alleged that under the authority of the regulations, the Bureau adopted a policy of testing all lots for compliance with safety standards and preventing distribution to the public of any noncomplying lots, and that notwithstanding this policy, the employees knowingly approved release of a noncomplying lot. The Court ruled that this claim was directed at governmental action that involved no policy discretion, and. thus the exception could not apply.[7] *Id.*

7. The Court also held that the discretionary function exception did not bar a claim that the government wrongfully licensed the drug manufacturer who produced the polio vaccine which caused Berkovitz's injuries. Berkovitz alleged that the National Institute of Health's Division of Biologic Standards (DBS) issued a license without receiving test data required by statutory and regulatory provisions. The Court reasoned that under such circumstances, the DBS had no discretion to issue a license and therefore the claim was not barred by the discretionary function exception. The Court also held that the

claim that the DBS licensed the vaccine despite its failure to comply with regulatory safety standards, may or may not be barred by the exception, depending upon whether, upon remand, the claim is interpreted to mean that DBS issued a license without determining compliance with relevant standards or after determining the vaccine failed to comply, or whether the claim is interpreted to mean that DBS made an incorrect compliance determination through the permissible exercise of policy choice. 108 S.Ct. at 1960–63.

*Berkovitz* controls our decision in this case. Certainly, the Defense Department's decision to entrust Celesco with the primary responsibility of ensuring that it complied with safety regulations and supervising plant safety involved the permissible exercise of policy judgment and is protected by the discretionary function exception. *Cf. Berkovitz*, 108 S.Ct. at 1964 (discretionary function exception barred any claim challenging the Bureau's formulation of policy as to the appropriate way in which to regulate the release of vaccine lots); *Varig Airlines*, 467 U.S. at 819–20, 104 S.Ct. at 2767 (same with respect to the FAA's formulation of policy about how to regulate airplane safety). So, too, are any of the policy judgments made by officials in implementing the Defense Department's policies and programs. *Berkovitz*, 108 S.Ct. at 1964; *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767.

However, as discussed, the discretionary function exception does not apply to acts which do not involve the permissible exercise of discretion. *Berkovitz*, 108 S.Ct. at 1964. In the case before us, as in *Berkovitz*, the initial discretion granted by the regulations to the Defense Department was broad; the inspectors, however, violated the Department's own policy directives by failing to comply with specific procedures mandated by the Defense Department. The procedures directed the inspectors to make sure that Celesco complied with numerous safety requirements at the plant. In particular, Item 16 of the inspector's 51–part checklist states: "Verify that the contractor complies with electrical storm procedure. Note: In the event of an electrical storm, DCAS personnel are to evacuate area of explosives in buildings. Notify QAR if this should occur." The checklist further directed the inspectors to check Celesco's compliance with this directive if an electrical storm occurred.

Thus, although Celesco had the primary responsibility for safety and the authority to evacuate the plant, the Department policy prescribed a course of action for the inspector to follow in the event of any electrical storm, and the inspector had no choice but to adhere to that directive. Hence, the discretionary function is not applicable. *Berkovitz*, 108 S.Ct. at 1964; *Aslakson v. United States*, 790 F.2d 688, 692–94 (8th Cir.1986) (claim that agency officials failed to comply with their own safety policy is not barred by the discretionary function exception); *Mandel v. United States*, 793 F.2d 964, 967 (8th Cir. 1986) (claim that National Park Service's failure to warn of hazardous conditions in a park was not covered by discretionary function exception, because the park violated its own previously adopted safety policy); *Collins v. United States*, 783 F.2d 1225, 1228–31 (5th Cir.1986) (claim that Mine Safety and Health Administration failed to close mine, when challenged decisions did not involve "policy" decisions, or any explicit mandatory duties is not barred by discretionary function exception). *Cf. Allen v. United States*, 816 F.2d 1417, 1421 (10th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988) (no evidence that test site personnel ignored or failed to implement specific procedures mandated by agency guidelines). While it is true that the government introduced some evidence for the purpose of tending to show that there was some exercise of discretion in the manner in which it performed its safety inspections, the evidence we have set forth above, in our judgment, goes directly to the nature of the challenged conduct that is the critical issue in this case, namely, the failure to evacuate the plant because of the approaching thunderstorm. Here, the government inspectors had no discretion. Evacuating the plant was mandated.[8] The district court

---

8. The government also argues that the decision to cease performance of the contract is a discretionary decision protected by the exception. The government maintains that when a safety violation is detected, the inspector had a choice of ordering a variety of corrective actions, and the inspector therefore must weigh policy considerations to determine the appropriate action. Here, however, the inspector was explicitly directed in the event of an electrical storm to ensure that the contractor evacuated the plant. Thus, the particular violation at issue here did not involve the weighing of any facts or policies and was therefore not discretionary. *Berkovitz,*

did not err in refusing to dismiss the employee's claim under the discretionary function exception.

### B.

The government further maintains that even if the discretionary function exception does not apply, under Arkansas law the government had no actionable duty under the circumstances of this case and therefore the district court erred in holding the government liable. *See* 28 U.S.C. § 1346(b).

In *McMichael*, after examining in detail the relevant Arkansas law, 751 F.2d at 308–10, we affirmed the district court's ruling that under Arkansas law, an employer of an independent contractor has a duty to use due care to prevent the contractor from conducting inherently dangerous or ultrahazardous activities without proper precautions. We held that this conclusion was supported by several principles of Arkansas law, including: 1) Arkansas cases which hold that one who hires an independent contractor is liable for his own negligence, especially when he performs activities in relation to the work negligently; 2) the Restatement (Second) of Torts § 414 (1965), which provides that an employer of an independent contractor who exercises control over any part of the contractor's work is subject to liability to those injured as a result of the employer's failure to exercise the control with reasonable care; and 3) other FTCA cases which hold that one who hires an independent contractor to do extra-dangerous work or ultrahazardous work has a duty to exercise reasonable care to see that the contractor takes proper precautions to protect those who might sustain injury from the work. *McMichael*, 751 F.2d at 308–10.

On appeal, the government once again argues that Arkansas law recognizes no duty under which the government may be held liable. Pointing to the DOD Safety Manual and regulations, the government maintains that its inspectors had no authority, duty or control over the evacuation of the Celesco plant. The government argues that this was the exclusive responsibility of Celesco, and therefore, the government cannot be held liable for the negligence of its independent contractor.[9] *See Jackson v. Petit Jean Electric Co-Op*, 268 Ark. 1076, 599 S.W.2d 402, *affirmed*, 270 Ark. 506, 606 S.W.2d 66, 69 (1980).

■ The district court found, however, that the government retained a substantial degree of control over Celesco. This finding is fully supported by the record. The government incorporated its safety regulations into the Celesco contract. These regulations required Celesco to evacuate the plant during an electrical storm. The government placed on-site inspectors at the plant and the inspectors had the authority and the duty to ensure that Celesco complied with the safety regulations of the contract. The inspectors were required to ensure that Celesco evacuated the plant during an electrical storm and were directed to contact the contracting officer who

---

108 S.Ct. at 1964; *cf. also Boyle v. United Technologies Corp.*, —— U.S. ——, ——, 108 S.Ct. 2510, 2517, 101 L.Ed.2d 442 (1988) (selection of appropriate design for military equipment involves balancing of technical, military and social considerations and is a discretionary function); *Prelvitz v. Milsop*, 831 F.2d 806, 810 (8th Cir.1987).

9. The United States did not relieve itself from liability to the employees by incorporating this exculpatory clause into its contract with Celesco:

> Neither the requirements of this clause nor any act or failure to act by the Government in surveillance or enforcement thereof shall affect or relieve the Contractor of responsibility for the safety of his personnel and his property and for the safety of the general public in connection with the performance of this·contract, or impose or add to any liability of the Government for such safety. The Contractor is not entitled to rely on the requirements of this clause or on any Government surveillance or enforcement thereof, or lack thereof, or granting of any waiver or exemption in accordance with DoD 4145.26M in discharging the Contractor's responsibility.

32 C.F.R., § 7–104.79(d) (1984), incorporated in the contract by reference. It was the Celesco employees to whom the United States owed a duty, and the government did not relieve itself of that duty through Celesco's limitation of its employees' rights. *See Toole v. United States*, 588 F.2d 403, 407 n. 5 (3d Cir.1978).

could order the inspector from the plant, which according to the contract, would close the plant. Accordingly, we cannot say the court erred in concluding that the government retained a sufficient degree of control over Celesco to render the government liable under Arkansas law.

## II.

The government next contends that the district court erred in allowing three of the plaintiffs to increase their damage claims above the amount of their administrative claims.[10]

### A.

■ As a jurisdictional prerequisite to a suit under the FTCA, an administrative claim must first be filed. 28 U.S.C. § 2675(a) (1982). Judicial action under the FTCA cannot be instituted for a sum in excess of the claim presented to the federal agency, unless the increased amount is based upon newly discovered evidence not reasonably discoverable at the time the administrative claim was presented, or upon allegation and proof of intervening facts relating to the amount of the claim. 28 U.S.C. § 2675(b). The district court permitted three of the employees to amend their complaints on the ground that under the circumstances of this case, inflation qualified as an "intervening fact."

■ The district court evaluated the differing affidavits of several experts and found that it was unforeseeable not only that inflation would occur, but also that this matter would remain in litigation over a decade. The court further noted that the government had taken full advantage of virtually every procedural barrier to concluding the matter and that to deny the employees' motion to amend the ad damnum clause would result in substantial injustice, contrary to the purposes of the FTCA. Thus, the court permitted the employees to increase their claims, concluding that inflation qualified as an "intervening fact" relating to the amount of the claim under 28 U.S.C. § 2675(b).

The government argues that inflation is a "permanent fixture" in the economy, see *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538, 103 S.Ct. 2541, 2551, 76 L.Ed.2d 768 (1983), and therefore cannot qualify as an unexpected or unforeseen event as required by § 2675(b). *See Martinez v. United States*, 780 F.2d 525, 528–30 (5th Cir.1986); *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 855–56 (2d Cir. 1984). The government further argues that even if inflation qualifies as an "intervening fact," the employees failed to show that it warranted the almost twofold increases allowed here.

The district court's finding that the inflation which occurred between 1976 and 1986 was unforeseen is fully supported by the record. Affidavits of two experts were submitted stating that the value of the dollar declined about 50% from 1976 to 1986 and that this decline was unforeseeable. *Cf. O'Rourke*, 730 F.2d at 856. Further, at the time the plaintiffs filed their administrative claims, it was certainly unforeseeable that the claims would remain unresolved for over ten years. The government, pointing to their expert's affidavit, argues that the average rate of inflation between 1976 and 1986 was 6.84%, only 1% above the rate of the preceding ten-year period, and therefore cannot be considered unforeseeable. Further, the government maintains that the 6.84% rate of inflation which did occur cannot justify allowing the employees to almost double the amount of their administrative claims.

---

**10.** The government appeal on this issue is limited only to plaintiffs Moody, Kelly and Madison, who were granted leave to increase their damage claims above their administrative claims on the basis of inflation. Moody's claim was increased from $433,495.37 to $863,495.37; Kelly's claim was increased from $652,774.80 to $1,302,774.80; and Madison's claim was increased from $206,505 to $411,505. Before trial on the issue of damages, the government entered into a stipulation of damages with plaintiffs Bartlett, Rogers, Weaver, Ray, McMichael, and Harrison. The district court awarded damages to plaintiff Walker below the amount of her administrative claim. The government does not appeal the district court's award of damages to plaintiff Lowe in excess of her administrative claim, conceding that the amendment was based on newly discovered evidence regarding the extent of Lowe's injuries.

The government, however, fails to consider that the employees had no way of knowing how long the matter would be in litigation when they filed their administrative claims. Moreover, by citing to the average rate of inflation, the government does not consider inflation's spiraling effects. Thus, we conclude that that in the unique circumstances of this case, the district court did not err in permitting the employees to amend their complaints.

### B.

The government also argues that by allowing damages above the amounts of the administrative claims, the district court, although labeling the award "inflation," actually allowed recovery for prejudgment interest. *See Preston v. United States,* 776 F.2d 754, 760 (7th Cir.1985). The FTCA bars an award of prejudgment interest. 28 U.S.C. § 2674. The government relies on the employees' expert economist affidavit which states: "[i]f prejudgment interest was allowable, (at the legal rate of 10%) there would be 90% accrued * * * to date, to almost double the original amount." Since the increases allowed were almost double the amount of the administrative claims, the government infers that the increases were actually an award of prejudgment interest.

We are satisfied that the district court did not allow a recovery for prejudgment interest. As discussed in Part IIA, *supra,* there is substantial evidence in the record that inflation occurring between 1976 and 1986 caused the value of the dollar to decline about 50%. The fact that roughly the same amount of interest would have accrued does not mean that the court awarded damages for prejudgment interest. Decline in the value of the dollar is not equivalent to an award of prejudgment interest. *Cf. Preston,* 776 F.2d at 760. The district court did not err in permitting the employees to amend their complaints.

### III.

The employees cross-appeal, arguing that the district court erred in dismissing their claims against Highland Resources. Specifically, the employees argue that the district court erred in ruling that Arkansas products and strict liability statutes did not apply to the lease of Building M–35; that Highland did not breach an implied warranty of fitness; that Highland was not negligent in leasing Building M–35 to Celesco; that the condition of Building M–35 did not cause or contribute to the explosion; and that punitive damages cannot be assessed against Highland.

### A.

The district court held that neither the Arkansas Products Liability Act, Ark. Code Ann. §§ 16–116–101–107 (1987) (previously Ark.Stat.Ann. § 34–2801–34–2802 (Supp.1985)), nor the Arkansas strict liability statute, Ark.Code Ann. §§ 4–86–102 (previously Ark.Stat.Ann. §§ 85.-2-318.1–318.2 (Supp.1985)) applied because the lease of Building M–35 does not qualify as a "product" within the meaning of the Arkansas statutes.

We accord great weight or deference to a federal district court's interpretation of state law. *Kansas State Bank v. Citizens Bank,* 737 F.2d 1490, 1496 (8th Cir.1984); *Pyle v. Dow Chemical Co.,* 728 F.2d 1129, 1130 (8th Cir.1984). The employees have not cited nor are we aware of any Arkansas cases which have applied product or strict liability statutes to the commercial leasing of an industrial building. *Cf. Blagg v. Hunt Co. Inc.,* 272 Ark. 185, 612 S.W.2d 321 (1981) (builder-vendor of a house considered the supplier of a product and therefore strictly liable for defective carpet in the house). Accordingly, we cannot say that the district court erred in dismissing the employees' claims under the Arkansas strict and product liability statutes.

### B.

Next, the employees claim that the district court erred in ruling that Highland did not breach its implied warranty of fitness in the Building M–35 lease. The court held that an "implied warranty is limited to latent defects which are not discoverable by subsequent purchasers upon reasonable

inspection and which became manifest only after purchase." *Blagg,* 612 S.W.2d at 322. The court ruled that such a warranty was not breached because any building defects (in particular, the lightning protection system) were discoverable upon reasonable inspection. We cannot conclude this finding is clearly erroneous. Both Celesco and the government had the opportunity to inspect and review Building M-35 before execution of the lease. It is undisputed that the government did not inspect the building, although the pre-award survey indicated otherwise. Moreover, it is not contended that the inadequacies in the lightning protection system were not discoverable upon reasonable inspection. Finally, Celesco, not Highland, had the responsibility of ensuring that the building complied with the contract requirements. As the district court noted, had Highland received notice of any building defects, Highland may have had a duty to take corrective action, but here, neither Celesco nor the government ever notified Highland of any defects. These findings are supported by the record and, accordingly, we cannot conclude that the district court erred in ruling that Highland did not breach any implied warranties of fitness contained in the lease.

### C.

 The employees also argue that the district court erred in ruling that Highland was not negligent in leasing Building M-35 to Celesco. Specifically, the government points to the testimony that Building M-35 was suitable to manufacture only Class 2 explosives, not Class 7 (which includes photo-flash cartridges), and that the building was not constructed so that the outside wall and roof would "blow out" upon explosion. Based on this testimony, the employees maintain that the building was dangerously defective at the time it was leased and that Highland negligently leased the building to Celesco. The district court ruled, however, that Highland did not breach any duty owed to Celesco, reasoning that although Highland represented that the building was generally suitable for a munition manufacturer, "Highland was not charged with a duty to review [Celes-

co's] bid solicitation to determine whether Celesco was to produce Class 7 or any other Class of explosives." Moreover, although the court made no specific finding whether the building was constructed in accordance with the recommended "shotgun theory," the court reasoned that this was of little consequence because Celesco's failure to keep the doors shut would have nullified any benefits of this type of construction. The court concluded that the building was not defective at the time the lease was executed. We have carefully reviewed the record and cannot conclude this finding is clearly erroneous. The district court did not err in ruling that Highland was not negligent in leasing Building M-35 to Celesco. Finding no basis for liability against Highland Resources, we reject the employees' argument that punitive damages should be assessed against Highland.

The district court is AFFIRMED.